IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DANIEL SERRANO,   :  Civil No.  3:23-CV-408
          :
   Plaintiff,   :
          :
 v.       :  (Magistrate Judge Carlson)
          :
KILOLO KIJAKAZI,[1]   :
Acting Commissioner of Social Security :
          :
   Defendant.  :

## MEMORANDUM OPINION

## I. Introduction

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial

_____

[1] Martin O'Malley became the Commissioner of Social Security on
December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of
Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo
Kijakazi as the defendant in this suit.

evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S. Ct. 206. <u>See</u> <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek v. Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

Daniel Serrano protectively filed an application for supplemental security income, on January 8, 2020. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Serrano was not disabled from the date of his application through the date of the ALJ's decision, November 3, 2021.

Serrano now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

The administrative record of Serrano's disability application reveals the following essential facts: Serrano protectively filed an application for supplemental security income, on January 8, 2020, alleging disability beginning January 1, 1989. This is not Serrano's first disability application.  A previous application for benefits was denied on October 9, 2019, alleging the same disability onset date, and the ALJ determined "good cause" to reopen did not exist under the regulations. Accordingly, the ALJ limited the instant claim to a period beginning January 8, 2020, the date the application was filed. (Tr. 22).

Serrano was born on October 11, 1972, and was 47 years old years old at the time of his application, which is defined as a younger individual under the regulations. (Tr. 38). He has a fifth-grade education, limited reading and writing ability,[2] and his primary language is Spanish. (Tr. 57, 58, 1085, 1087, 1090, 1163). Serrano was born in Puerto Rico and moved to Philadelphia with his family when he was fourteen years old. (Tr. 1164). He has never worked. (Tr. 58). He has a history

---

[2] Serrano's ability to read and write is at issue. The plaintiff argues he is illiterate, but the ALJ concluded he could read and write with limitations. The record demonstrates that Serrano frequently reported that he had limited reading and writing skills. (Tr. 893, Intake form states he can read and write; Tr. 1087, "Needs help with both reading and writing,"; Tr. 1090, "Reading and writing issues"; Tr. 1163, "limited reading and writing skills").

of substance abuse disorder and was previously incarcerated for over a decade. (Tr. 1164).

Serrano suffers from both psychological and physical impairments. Specifically, he suffers from uncontrolled Type 2 Diabetes Mellitus and associated disorders and the record demonstrates that he had trouble understanding and complying with the recommended treatment for his diabetes and consistently had an A1C above 8% and uncontrolled glucose levels. (Tr. 1726, 1730, 1983, 2006, 2254). He also, at times, seemed to have insurance challenges that made it difficult for him to obtain his diabetes treatments and testing equipment. (Tr. 902, 917, 928, 934, 1124, 1133, 1729). Furthermore, Serrano testified to his difficulties in complying with his diabetes treatment, stating that he has difficulty remembering to take care of his blood sugar and was told not to eat rice but does anyway because, "I am going to die." (Tr. 71).

Serrano also struggles with depression and anxiety linked to the tragic death of his infant daughter when he was eighteen years old as well as his period of incarceration. (Tr. 1156). He regularly reported auditory hallucinations including his daughter calling out to him, and the sound of prison keys and doors slamming, and he testified that he has to sleep with the lights on. (Tr. 68, 1156, 1483, 1900, 1933). His hearing testimony was somewhat enigmatic, as he testified to other

4

manifestations of his mental impairments unconnected to any etiology elsewhere in the record, such as an inability to use a fork because the food falls off, inability to cook without starting a fire, and one time leaving his house but not being able to find his way back home.[3] (Tr. 70-72).

In his application for disability benefits, Serrano alleged he was unable to work due to depression, anxiety, bipolar, obesity, diabetes, neuropathy, degenerative joint disease, and hypertension. (Tr. 386). In his function report, he stated that he has problems with his right leg and gets tired when he walks a lot and gets dizzy when he stands. (Tr. 636). He reported using a brace for his knee, ankle, and back and wearing glasses. (Tr. 641). He stated that, due to his bipolar disorder, he does not get along well with people, gets frustrated and upset if he has to be around people or talk to them, that his medications make him tired, and that he frequently stays inside in bed all day. (Tr. 637, 641) As to his personal care, he reported that he needs

---

[3] The hearing was held telephonically, and Serrano required the assistance of a Spanish interpreter. Though it is difficult to discern from the transcript alone, it appears that various factors, including connectivity issues, made the hearing disjointed and chaotic. It also seems the ALJ was displeased with Serrano's attorney's examination of the plaintiff, telling her multiple times to "hurry up" and when asked by the plaintiff's attorney if she was asking her to finish her questioning stated, "Well, I mean, it's taking too long, and it's just like you're essentially leading him to answer the questions. I mean, can you wrap up, please? Counsel?" (Tr. 71-72). Indeed, there was an aimless quality to the testimony of the plaintiff which made it difficult to match his testimony about his symptoms to any specific impairment.

assistance with dressing and personal care, uses a chair in the shower, and does not know how to use a fork or cook and only uses the microwave to prepare meals. (Tr. 637-38). He stated he sometimes helps to take out the trash but that his sister does most of the household chores. (Tr. 638). He reported that he does not know how to use a phone or computer and that his sister reminds him of appointments. (Id.) Serrano's function report further noted difficulties even lifting a gallon of milk due to his hands hurting, his back hurting if he sits for too long, and reported that he can only walk half a block before needing to stop and rest and can only pay attention for five minutes. (Tr. 640).

As to the objective medical evidence, the records show that, around 2015, while Serrano was incarcerated, he reported to the emergency department due to hyperglycemia and was diagnosed with type 2 diabetes. (Tr. 750-772). Upon his release in 2018, he began seeing CRNP Erika Shea at Congreso Health Center for his diabetes management who noted throughout 2018 and 2019 he was frequently out of medication for weeks at a time, or was not taking his medication, and at one point in 2018 was using his mother's insulin. (Tr. 902, 902, 917, 928, 934). He also reported not checking his blood glucose levels because he did not like to stick

himself. (Tr. 902). His A1C was consistently over 8% and his diabetes was referred to as uncontrolled.[4]

During the relevant period, in 2020, he continued care at Congreso Health Center with Dr. Brizuela. (Tr. 1729). In February 2020 he reported symptoms of extremity paresthesia and sexual dysfunction but denied changes in vision and reported that his health insurance did not cover glucose test strips. (Tr. 1124). In May 2020 he reported that he was without his medication due to it being sent to the wrong pharmacy and that he was only taking mealtime insulin once per day per his provider's instruction. (Tr. 1729). He was instructed to continue long-acting insulin, Trulicity, and take mealtime insulin with each meal of the day. (Tr. 1730). In May 2020 he presented to the emergency room for dizziness and fainting. (Tr. 1520). He was treated for dehydration and released. (Tr. 1540). In August 2020, he reported that he had fallen due to dehydration and continued to feel dizzy when standing. (Tr. 1726). His blood glucose was 248, with a normal range being 75-105. (Id.) He was also examined by orthopedics in February 2020 for a ganglion cyst of a finger on his left hand, though it is unclear if he received any further treatment. (Tr. 1125).

---

[4] His medical records indicate that one goal of therapy was for his A1C to be less than 7% without significant hypoglycemia.

Serrano underwent a consultative examination on September 2, 2020, by Dr. David B. Klebanoff. Serrano reported that he had ongoing ankle, knee, and back discomfort due to an abnormality in his right ankle but had not sought medical care, stating that he tried to avoid being on his feet for too long. (Tr. 1739). He was not using any assistive devices or support garments, (Tr. 1739), and the examination showed that he was in no acute distress, had a normal gait, could walk on his heels and toes without difficulty, full squat, normal stance, needed no help getting on and off the exam table, and was able to rise from a chair without difficulty. (Tr. 1741). Serrano reported that he was diagnosed with diabetes at age thirty-nine and reported neuropathy symptoms in his feet with pins and needles. (Tr. 1740). He also stated that he had high blood pressure but experienced no associated symptoms. (Id.) Dr. Klebanoff explained that Serrano lived with his mother, could cook, clean, do laundry, shop, shower, bathe, and dress, and spent his day watching TV and listening to music.[5] (Tr. 1740-41). Dr. Klebanoff also examined his vision which was reported

---

[5] As discussed below, Dr. Klebanoff's characterization of Serrano's ability to perform activities of daily living is not consistent with Serrano's own reports on the medical history form he completed for the examination in which he states his mother does the cooking, cleaning, laundry, and shopping, and he bathes and dresses with assistance. (Tr. 1755). The Commissioner argues Dr. Klebanoff's characterization was based on the form along with supplemental evidence from the record which was consistent with his ability to perform cooking, cleaning, laundry, and shopping.

as 20/40 without glasses and 20/25 with glasses, (Tr. 1741), and noted intact hand and finger dexterity with 5/5 grip strength bilaterally. (Tr. 1742).

In March 2021, Serrano saw orthopedic surgery and was diagnosed with right foot posterior tibial tendinosis and mild pes planus (flat feet) and was prescribed an airlift brace and long-term orthotics. (Tr. 1961).

Serrano also begin receiving care at Lancaster General Health for his diabetes in 2021. In April 2021, it was noted that his diabetes course had been stable, and he denied any severe hypoglycemic or severe hyperglycemic episodes or any issues with his current regimen. (Tr. 1989). He reported symptoms of fatigue, blurred/double vision, leg swelling, and back and joint pain. (Tr. 1981). His A1C was 10.1%, with a goal of 7%. (Tr. 1983). His doctor noted that Serrano seemed to have a very limited understanding in regard to diabetic management, was not following any diet, had been drinking sugary drinks, and was not interested in diabetes management classes. (Id.) At his appointment on July 20, 2021, he had not completed blood work to test his A1C, but reported that his blood sugars were better, however one week later it was noted his A1C was 10.2% and his glucose was still uncontrolled. (Tr. 2254).

As to Serrano's mental impairments, he received regular individual therapy and medication management for his bipolar depression and anxiety prior to and

throughout the relevant disability period. He was treated at North East clinical from 2010 to 2015 and Gaudenzia Clinic from 2018 to January 2019 and started individual therapy at COMHAR in July 2019. (Tr. 1155). He also attended substance abuse treatment. (Id.) While incarcerated at SCI Houtzdale, records indicate he was stable on his psychological medication and denied mental health concerns. (Tr. 792-809). He completed substance abuse treatment in early 2019 at Casa de Consejeria for cocaine use, (Tr. 887-889), and continued intensive outpatient substance abuse treatment until early 2019. (Tr. 1030-1052). He underwent a comprehensive biopsychosocial evaluation at COMHAR in September 2019 in which it was revealed he was depressed due to memories of his daughter dying and going to jail for a murder. (Tr. 1156). He reported hearing his daughter calling him and hearing keys from the jail and slamming of the jail door. (Id.) He reported a drug overdose suicide attempt in 2016 but denied any present suicidal or homicidal ideation. (Id.) He denied any history of inpatient mental health treatment. (Tr. 1158). He noted that he was living alone, and a mental status examination revealed socially appropriate behavior with no motor or speech difficulties and intact memory. (Tr. 1160-61).

Serrano continued individual therapy at COMHAR during the relevant period. Throughout 2020 his therapist at COMHAR reported unremarkable mental status examination findings consistently reporting that he was cooperative and oriented

10

with normal judgment and that he was compliant with his medication and denied any side effects, (Tr. 1481-1498, 1660-1664, 1763-1773), though he did consistently report mild impairments to Serrano's memory and attention. (Tr. 1177, 1179, 1185, 1481, 1494, 1658, 1660, 1763, 1767, 1773, 1922, 1928, 1939, 1950, 1952). In January and early February, 2020, he noted he was still hearing voices three times and it was noted his poor control of his hallucination symptoms caused him anxiety. (Tr. 1483-85). However, by February 20, 2020, he reported doing well, staying sober, and denied hallucinations. (Tr. 1487). With the beginning of the Coronavirus pandemic in March 2020, Serrano reported feeling depressed and frustrated being unable to leave home but reported compliance with exercises and medications and noted "I am positive," and denied hallucinations. (Tr. 1491).

Throughout 2020 and 2021, his therapy records indicate that, while he did occasionally report still having auditory hallucinations, (Tr. 1662, 1900, 1933), he often denied hallucinations during his visits and reported that his anxiety and depression were related to the pandemic. (Tr. 1660, 1662, 1767). In February 2020, June 2020, January 2021, and July 2021 he reported hearing voices two to three times per week, (Tr. 1485, 1662, 1900, 1933), but there is no evidence he sought any treatment beyond his individual therapy session and, at the same time, he frequently reported that he was compliant with his medications, which helped his condition,

and that he dealt with his stress and anxiety by socializing with his family and friends, practicing relaxation techniques, and trying to stay busy outside the house. (Tr. 1481-1498, 1660-1664, 1763-1773).

In early June 2020 he reported feeling well and being less anxious but being stressed due to Covid but helping his family with grocery shopping and calling his friends frequently. (Tr. 1660). By late June, he reported hearing voices three times per week and was sad due to the current social and pandemic situation. (Tr. 1662). In July 2020 he noted that he was nervous and having lots of thoughts about his past due to having to stay home and was worried about a drug relapse. (Tr. 1664). In August and September 2020, he reported less anxiety and good motivation to do his daily activities like leaving home and doing the household chores. (Tr. 1765). He stated that he believed his medication was working and he was feeling better and more positive. (Id.) His therapy reports wax and wane, sometimes noting he was feeling better and positive, but often reporting feeling alone, sad, and bored due to the pandemic. He occasionally reported poor sleep but also reported drinking 10 cups of coffee per day. (Tr. 1902).

Throughout 2021, his mental status examinations continued to present a mixed picture regarding his mental health. In January 2021 he reported hearing "voices of cops" daily, seeing shadows, and sleeping with the lights on but his

12

behavior was reported as socially appropriate with cooperative attitude, average intellectual functioning, and intact memory. (Tr. 1902-06). In February 2021, he reported feeling better from his medical conditions which increased his mood and by April 2021 he reported feeling calmer and less impulsive with others and that his medication was working and that he had visited his family and was happy and was sleeping well. (Tr. 1944, 1947). In May 2021 he reported that he continued to do well, was communicating well with his family, and was doing many activities outside of his home because the weather was nice. (Tr. 1950-52). In early July he reported feeling hopeless and sad and hearing voices twice per week, but later that month he stated that he was feeling better and hearing voices less after his doctor changed his medication. (Tr. 1933-36).

Based upon this clinical history, several medical sources opined regarding the disabling effect of Serrano's impairments. On May 18, 2020, State psychological consultant Dr. Richard Small reviewed Serrano's medical records and completed a mental RFC assessment. Dr. Small opined that Serrano had no understanding and memory limitations and was not significantly limited in his ability to carry out very short and simple instructions or detailed instructions, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, or complete

a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 395). He did find that Serrano was moderately limited in his ability to maintain attention and concentration for extended periods and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Id.) Dr. Small also opined that Serrano had social interaction limitations, including being moderately limited in his ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, but that he was not significantly limited in his ability to ask simple questions or request assistance, get along with coworkers or peers, or maintain socially appropriate behavior. (Tr. 395-96). Although Dr. Small opined that Serrano would be moderately limited in his ability to travel in unfamiliar places or use public transportation, he found he would not be significantly limited in his ability to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, or set realistic goals or make plans independently of others. (Tr. 396). Dr. Small explained his RFC by noting that Serrano had a fifth-grade education, had been treated for depression and drug use, and did not like being around people but that some of his limitations were primarily physical. (Id.) Thus, he opined that Serrano was able to meet the basic mental demands of simple, routine tasks on a sustained basis despite the limitations resulting from his impairments. (Id.)

14

On reconsideration, State psychological consultant Dr. Marci Cloutier agreed with the limitations opined by Dr. Small and affirmed the decision. (Tr. 416).

In September 2020, based on his examination of the plaintiff and review of the record, consultative examiner Dr. Klebanoff opined as to Serrano's physical residual function capacity. Dr. Klebanoff opined that Serrano could continuously lift and carry up to twenty pounds, frequently up to fifty, and occasionally up to 100 pounds. (Tr. 1744). He further opined that Serrano could sit for eight hours at a time and total in an eight-hour workday and could stand and walk for three hours at a time and six hours total in an eight-hour workday. (Tr. 1745). He found no limitations in Serrano's use of his hands and left foot but opined that Serrano could operate foot controls with his right foot frequently. (Tr. 1746). As to Serrano's postural activities, Dr. Klebanoff opined that he could occasionally climb ladders or scaffolds, but could frequently climb stairs and ramps, stoop, kneel, crouch, and crawl and could continuously balance. (Tr. 1747). Dr. Klebanoff found no limitations in Serrano's ability to hear or see and noted no environmental limitations. (Tr. 1747-48).

Two State medical consultants also analyzed Serrano's physical impairments after a review of his record. On October 1, 2020, Dr. Charles Hubbard opined that Serrano's medically determinable impairments were not severe, citing his activities of daily living, consultative examination showing no sensory deficits. (Tr. 402). His

15

opinion was also affirmed on reconsideration by Dr. Joanna Deleo, who noted he was capable of personal care, taking out the trash, and shopping, ER records from May 2020 showing controlled blood pressure, normal ROM/coordination/sensory/gait, and normal EKG, and a PCP note from August 2020 showing his hypertension and diabetes were controlled. (Tr. 409). Dr. Deleo also noted no end organ damage from Serrano's hypertension or diabetes. (Id.)

On May 1, 2019, Erika Shea, CRNP, from Serrano's primary care provider, Congreso Health Center, completed a one-page form stating that Serrano was "temporarily disabled" from the date of the form, May 1, 2019, expected to last until December 31, 2022. (Tr. 1960). She noted his diabetes, hypertension, knee pain, ad low back pain but did not include any additional detail. (Id.) The record also contains a note from Dr. Denyse Allen on July 22, 2021, stating he has been unable to work for medical reasons and may return to work on August 2, 2021, with light duty (no lifting greater than 20 pounds and must be able to change position from sit to stand when needed). (Tr. 2264-65).

A telephonic disability hearing was conducted on September 21, 2021, at which Serrano, with the assistance of a Spanish interpreter, and a vocational expert testified. (Tr. 47-81). At the hearing, Serrano testified about his symptoms, stating he could not lift or carry anything due to a hernia, (Tr. 62), could sit for twenty

minutes and stand for ten to fifteen minutes and walk twelve steps. (Tr. 62-63). He stated that he cannot reach because of his back. (Tr. 64). As to his activities of daily living, Serrano testified that he could wash dishes and fold clothes but that he was not allowed to cook because he caused a fire, could not use a phone or a fork, showered using a chair in the tub, needed reminders to take his medications, and could not use money or leave home alone. (Tr. 64-70). He testified that he hears his deceased daughter calling him and sleeps with the light on. (Tr. 68). He also testified that he drinks ten cups of coffee per day despite doctors telling him it is affecting his sleep. (Tr. 67). He stated that he gets dizzy every day and falls and that he was denied a job cutting grass because he was getting dizzy. (Tr. 59, 71). He stated that he took ten years of classes in prison but could not pass his GED because he did not know how to read, (Tr. 70-71), and that he cannot remember things after taking his medicine and once left his house alone had had to be brought back by the police because he did not know how to get home. (Tr. 70, 72).

Following the hearing, the ALJ issued a decision denying Serrano's application for benefits. (Tr. 21-39). In that decision, the ALJ first concluded that Serrano had no earnings of record and had not engaged in substantial gainful activity since January 8, 2020, the date of his application. (Tr. 24). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Serrano

had the following severe impairments: diabetes mellitus with neuropathy, tibial tendinitis of the right leg, obesity, residuals of transient ischemic attack ("TIA"), depression, and anxiety. (Id.) The ALJ also considered Serrano's hypertension and hyperlipidemia, hypothyroidism, and diabetic retinopathy with low vision, back pain, hand impairment, dizziness, and substance abuse but found these impairments to be non-severe. (Tr. 24-26). The ALJ further concluded that Serrano's knee pain and hernia were not medically determinable impairments. (Tr. 26).

At Step 3, the ALJ determined that Serrano did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 26-29). Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered Serrano's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except he can frequently operate foot controls with the right. He can never climb ladders, ropes, or scaffolds; and frequently perform other postural activities. The claimant can never be exposed to unprotected heights. He can perform simple, routine tasks; make simple, work-related decisions; have no contact with the public, and can have occasional contact with supervisors and co-workers. Additionally, the claimant is limited to work involving things or objects rather than data or people, and only occasional changes in the work setting.

(Tr. 29-30)

In fashioning the RFC, the ALJ considered the medical evidence and Serrano's testimony regarding his impairments. The ALJ first engaged in a two-step process to evaluate Serrano's alleged symptoms. She found that, although the claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms, Serrano's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 31).

In making this determination, the ALJ considered Serrano's above-summarized function report and hearing testimony regarding his impairments and limitations and noted that he alleged significant physical limitations that were not supported by his medical treatment. (Tr. 32). The ALJ noted that the medical evidence supported only mild to moderate impairments even with only conservative treatment. (Id.) For example, the ALJ summarized the longitudinal medical records and concluded that his diabetes with neuropathy and any coinciding constitutional symptoms were adequately accommodated by a restriction to medium work except he can never climb ladders, ropes, or scaffolds or be exposed to unprotected heights. (Id.) Further the ALJ accounted for Serrano's ankle impairment with a restriction to only frequent operation of food controls on the right, never climbing ladders, ropes

or scaffolds or being exposed to unprotected heights and only frequently performing other postural maneuvers.

As to Serrano's mental impairments, the ALJ acknowledged his depression symptoms, auditory hallucinations, and mild memory impairments, but explained that the evidence supports generally mild to moderate symptoms with few significant abnormalities on examination. (Tr. 35). The ALJ also highlighted inconsistencies in the evidence, for example Serrano's testimony that he was significantly limited in walking and leaving home, but frequent reports to his therapist that he was motivated to go out and go walking to relieve tension and stress, and his testimony that he could not drive despite him being the driver in his 2021 car accident. (Id.) She also acknowledged his hallucinations, sleep difficulty, anxiety, and frustration, but noted he did not report significant distress as a result and never required a higher level of care. (Id.) The ALJ also highlighted that Serrano exhibited only mild impairments in memory and attention which required no significant changes in medication or treatment frequency. (Id.) Based on the ALJ's summary of the evidence regarding Serrano's mental impairments, she concluded that he had only mild to moderate limitations resulting from his depression and anxiety which were adequately accounted for in the RFC. (Tr. 35-36).

Finally, in fashioning the RFC, the ALJ considered the medical opinions and prior administrative medical findings. The ALJ found the May 2019 employability form completed by Serrano's treating provider Erika Shea, CRNP, stating he was "temporarily disabled" neither valuable nor persuasive since it offered only a conclusory statement on an issue reserved for the Commissioner. (Tr. 36).

The ALJ found the opinions of State psychological consultants Dr. Small and Dr. Cloutier generally persuasive, agreeing that the longitudinal evidence and the consultants' explanations supported mild to moderate limitations in mental functioning. (Tr. 36). Although Dr. Cloutier noted that Serrano's impairments would not preclude one-to two-step functions on a consistent basis, the ALJ instead restricted Serrano to simple, routine tasks which may involve more than one- to two-step functions, but still adequately accommodate mild to moderate limitations. (Id.)

The ALJ found the opinions of State medical consultants Dr. Hubbard and Dr. Deleo finding Serrano had no severe physical impairment to be not persuasive. The ALJ noted that evidence obtained at the hearing level supported ongoing diabetes, obesity, and right lower extremity abnormalities and concluded that those impairments were severe but adequately accommodated by a range of medium work with the noted postural and environmental restrictions. (Tr. 36-37).

The ALJ also considered the opinion of consultative examiner Dr. Klebanoff and found it partially persuasive. The ALJ agreed that Dr. Klebanoff's examination supported a range of medium work with postural limitations and restrictions on the use of his right foot but found no basis for a conclusion of stand and/or walk three hours in an eight-hour workday as the findings with respect to Serrano's lower extremities were not that significant, noting normal strength in lower extremities and normal gait and the lack of formal electrodiagnostic study confirming neuropathy. (Tr. 37). Moreover, the ALJ noted that the longitudinal evidence, including complaints of dizziness, combined with his obesity, right foot impairment, and diabetes, was more consistent with restrictions to never climbing ladders, ropes, or scaffolds and no exposure to unprotected heights. (Id.)

Finally, the ALJ considered the July 2021 statement by Dr. Allen noting that Serrano had been unable to work for medical reasons and could return to work on August 2, 2021, at light duty. The ALJ found this opinion not persuasive, noting that it was unsupported by Dr. Allen's examination from that date and inconsistent with other examinations and longitudinal evidence noting full strength in the extremities, generally normal gait and balance, and mild degenerative changes in the lumbar spine. (Tr. 37).

Having arrived at this RFC assessment, the ALJ concluded that Serrano had no past relevant work, but that, considering his age, education, work experience, and RFC, there were jobs that existed in the significant numbers in the national economy that Serrano could perform. (Tr. 38). The ALJ considered the testimony of the vocational expert, who testified that an individual of Serrano's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as laundry laborer (DOT 361.687-018) medium unskilled work (SVP 2) with approximately 239,000 jobs nationally; kitchen helper (DOT 318.687-010) medium unskilled work (SVP 2) with approximately 396,000 jobs nationally; and hand packer (DOT 920.687-018) medium unskilled work (SVP 2) with approximately 600,000 jobs nationally.

This appeal followed. (Doc. 1). On appeal, Serrano argues that the ALJ committed multiple errors in interpreting the medical evidence and evaluating his subjective symptoms and that the RFC is not supported by substantial evidence. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that he is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v.

Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based in part upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In Hess, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931

F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the Hess decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe

physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of

29

the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a

physician is misguided." <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. <u>Biller</u>, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. <u>See Titterington v. Barnhart,</u> 174 F. App'x 6, 11 (3d Cir. 2006); <u>Cummings v. Colvin</u>, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if

it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113, 129 (3d Cir. 2002); <u>see also Metzger v. Berryhill,</u> No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory

explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Id.</u> at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 433 (3d Cir. 1999).

### D.   <u>Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms</u>

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported pain. When evaluating lay testimony regarding a claimant's reported degree of pain and disability, we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations, and this Court defers to the ALJ's assessment of credibility. <u>See Diaz v. Comm'r</u>, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether there is substantial evidence to support an administrative law judge's decision, we owe deference to his evaluation of the evidence [and] assessment of the credibility of witnesses...."). However, the ALJ must specifically identify and explain what evidence he found not credible and why he found it not credible. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare*, 714 F.2d 287, 290 (3d Cir.1983)); <u>see also Stout v. Comm'r</u>, 454 F.3d

1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony"). An ALJ cannot reject evidence for an incorrect or unsupported reason. <u>Ray v. Astrue</u>, 649 F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir.1993)).

<u>Zirnsak v. Colvin</u>, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

Great weight is given to a claimant's subjective testimony only when it is supported by competent medical evidence. <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 409 (3d Cir. 1979); accord <u>Snedeker v. Comm'r of Soc. Sec.</u>, 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a claimant's subjective testimony that is not found credible so long as there is an explanation for the rejection of the testimony. Social Security Ruling ("SSR") 96–7p; <u>Schaudeck v. Comm'r of Social Security,</u> 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

<u>McKean v. Colvin</u>, 150 F. Supp. 3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports of pain under a standard of review which is deferential with respect to the ALJ's well-articulated findings, but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled."). It is well-settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. §404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR

16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to: medical signs and laboratory findings, diagnosis and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has

received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014); Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015).

It is against this backdrop that we evaluate the decision of the ALJ in this case.

## E.  The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Serrano retained the residual

functional capacity to perform medium work with the articulated limitations. Therefore, we will affirm this decision.

At the outset, the plaintiff argues that the ALJ repeatedly misinterpreted the record and medical evidence and then relied upon this mischaracterized evidence throughout the five-step sequential analysis. On this score, we are reminded of that our inquiry extends only to whether the ALJ's decision was supported by substantial evidence. Thus, notwithstanding an argument that the medical evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)).

Here, substantial evidence supports the ALJ's characterization of Serrano's impairments. Moreover, the plaintiff highlights these alleged mischaracterizations of the evidence but has failed to argue exactly how a characterization of the evidence which supports his view would have changed the disability determination. Thus, the plaintiff leaves it up to the Court to determine how, if the ALJ had interpreted the evidence as the plaintiff instructs was proper, this would have changed the RFC or the plaintiff's ability to perform work at the medium exertional level.

For example, the plaintiff vigorously argues that the ALJ failed to include the plaintiff's "mild visual limitations" in the RFC but does not articulate exactly what these visual limitations are or how they affected the plaintiff's ability to work at a medium exertional level. In fact, the plaintiff testified only that the outside of his eye was swollen, and surgery was recommended but he did not want to do it, (Tr. 74), and his attorney was unsure whether the surgery was for his retinopathy or cataracts. (Tr. 75). And, despite his complaints of blurred vision on a few occasions in the record, (Tr. 1125, 1981, 2004). which were accounted for by the ALJ, and evidence that he wore glasses, there is no evidence that his vision was a problem as far as his ability to perform daily tasks. In fact, the consultative examination showed his vision was 20/25 when wearing glasses and he reported watching TV and was the driver of a car in a 2021 accident. (Tr. 1741).

The plaintiff takes issue with the failure to include any vision limitation in the RFC after, in the ALJ's Step 2 analysis finding Serrano's visual impairments non-severe, the ALJ noted "no more than mild limitations affecting his ability to perform work activity." (Tr. 25). Thus, it appears the plaintiff argues that this "no more than mild" limitation should have been included in the RFC.[6] On this score, the Third

_____

[6] The plaintiff also argues that the ALJ misinterpreted a single, ambiguous note from Serrano's ophthalmologist stating "Mod-Severe NPDR with edema [both eyes];

Circuit has held that "no incantations are required at steps four and five simply because a particular finding has been made at steps two and three. Those portions of the disability analysis serve distinct purposes and may be expressed in different ways." Hess v. Comm'r Soc. Sec., 931 F.3d 198, 209 (3d Cir. 2019). Thus, the ALJ's Step 2 finding that Serrano's vision caused no more than mild limitations in his ability to perform work-related activities did not automatically create an obligation to include a visual limitation in the RFC. Moreover, the ALJ supported the determination that Serrano's visual impairments were non-severe and caused no more than mild limitations on the conservative treatment and his ability to watch television and drive a car. (Tr. 25). The plaintiff bears the burden of demonstrating his functional limitations but fails to point to any other evidence in the record to support her contention that the ALJ should have incorporated a visual limitation into the RFC. Since the plaintiff points us to no evidence that the plaintiff's vision was functionally limited or caused any difficulties in his daily activities, we find

---

improved [left eye], not significant [right eye]." The ALJ interpreted this to mean, "his left eye was improved, and his right eye was stable." (Tr. 25). The plaintiff argues this note actually meant there was no significant *improvement* in the right eye. Whatever the meaning of this single ambiguous note, we find the balance of the longitudinal evidence weighs in favor of the ALJ's determination not to include any visual limitations in the RFC.

substantial evidence supported the ALJ's decision not to include any visual limitations in the RFC.

Similarly, the plaintiff alleges that the ALJ mischaracterized the evidence of his uncontrolled diabetes and failed to consider the combined effects of his diabetic impairments and comorbidities, instead analyzing them separately. In considering Serrano's uncontrolled diabetes, the ALJ acknowledged that his A1C was consistently high but noted that the significant physical limitations he alleged were not supported by his medical treatment, which was conservative, or the relatively benign consultative examination results. Indeed, our review of the record supports the view that the symptoms associated with Serrano's diabetes and related impairments were appropriately accommodated for in the ALJ's analysis. For example, Dr. Klebanoff's consultative examination showed that he was in no acute distress, had a normal gait, could walk on his heels and toes without difficulty, full squat, normal stance, needed no help getting on and off the exam table, and was able to rise from a chair without difficulty. (Tr. 1741). The ALJ also noted that, although Serrano's records demonstrate abnormal A1C and reported symptoms of blurred vision, malaise, fatigue, and intermittent dizziness, his examinations were generally normal and he did not required hospitalization for hyper-or hypoglycemic episodes, only engaged in specialized endocrinology care in 2021, and did not seek any

41

ongoing cardiology or neurological treatment or pursue any additional treatment for his vision. The ALJ also properly considered the opinions of the medical examiners in her treatment of his diabetes and associated conditions, who considered his uncontrolled blood sugar in reaching their conclusions. Thus, again, although the plaintiff argues that the ALJ mischaracterized Serrano's blood sugar levels as "under control" despite chronically high A1C levels, the ALJ clearly considered these uncontrolled blood sugar levels along with the other longitudinal evidence of the plaintiff's associated symptoms in fashioning the RFC. And beyond pointing to the plaintiff's high A1C levels, the plaintiff has not highlighted any objective medical evidence tending to show that the plaintiff's symptoms were more severe than characterized by the ALJ or required any more conservative limitations.[7]

We also find the ALJ properly considered and characterized Serrano's mental health conditions and symptoms. The plaintiff argues that the ALJ erred in finding

---

[7] The plaintiff also challenges the ALJ's conclusion that the plaintiff had no sensory deficits since neuropathy and blurred vision are by definition sensory deficits. However, the ALJ considered these symptoms, but explained that, *on examination*, the plaintiff exhibited no sensory deficits and had not undergone electrodiagnostic testing to confirm neuropathy. Thus, although Serrano reported symptoms of extremity paresthesia in 2019 and early 2020, (Tr. 1133, 1124, 1130), and reported blurred vision on a few occasions, (Tr. 1125, 1981, 2004), the ALJ properly relied upon objective examination results showing overall normal gait and normal strength in the plaintiff's extremities in considering the severity of these symptoms.

his hallucinations did not cause him "significant distress," mischaracterized his years of varying levels of mental health treatment as "conservative," failed to consider his history of suicide attempts, mental health hospitalization, and parasuicidal behaviors, and mischaracterized his memory and attention impairments as mild. However, our view of the record supports the finding of the ALJ. In a comprehensive biopsychosocial evaluation completed by his treating therapist in September 2019, Serrano reported a suicide attempt three years prior, in 2016, but denied inpatient treatment for mental health reasons. (Tr. 1156, 1158). In fact, at that evaluation, and repeatedly during the relevant period, Serrano denied suicidal or homicidal ideations. (Tr. 1157, 1481-1498, 1660-1664, 1763-1773). Throughout 2020 and 2021, his therapy records indicate that, while he did occasionally report still having auditory hallucinations, (Tr. 1662, 1900, 1933), he often denied hallucinations during his visits and reported that his anxiety and depression were related to the pandemic. (Tr. 1660, 1662, 1767). In February 2020, June 2020, January 2021, and July 2021 he reported hearing voices two to three times per week, (Tr. 1485, 1662, 1900, 1933), but there is no evidence he sought any treatment beyond his individual therapy session and, at the same time, he frequently reported that he was compliant with his medications, which helped his condition, and that he dealt with his stress and anxiety by socializing with his family and friends, practicing relaxation

techniques, and trying to stay busy outside the house. (Tr. 1481-1498, 1660-1664, 1763-1773).

As to his memory impairments, Serrano's treating therapist consistently reported only mild memory impairments, as acknowledged by the ALJ. (Tr. 1177, 1179, 1185, 1481, 1494, 1658, 1660, 1763, 1767, 1773, 1922, 1928, 1939, 1950, 1952). Moreover, the ALJ properly highlighted inconsistencies between Serrano's testimony as to his mental limitations, and the medical records. As the ALJ noted:

> Though the claimant's records show a history of treatment for mental health symptoms, the evidence since his application date supports generally mild to moderate symptoms with few significant abnormalities on examination. The claimant has shown improvement or stability with conservative care; his provider noted he was doing fairly well with medications despite problems with sleep. (Exhibit D12F). He told his therapist he was engaging in useful coping strategies; he reported improvement in communication with his family, and he described interaction with friends. (Exhibits D16F, D27F). Though the claimant testified to significant limits in walking and leaving the home, he reported to his therapist he was motivated to go out and to go walking because it helped relieve tension and stress. The evidence contains additional inconsistencies: the claimant reported he did not drive and could not cook, but he told otherwise to the consultative examiner, and records show he was driving when he had an accident. (Exhibits D15F, D31F). He endorsed intermittent hallucinations but did not report significant distress as a result. While there are symptoms of hallucinations, sleep difficulty, anxiety and frustration, the claimant did not require a higher level of care. He continued to exhibit only mild impairments in memory and attention, and there is no suggestion he required significant changes in medication or treatment frequency. (Exhibits D12F, D16F, D27F).

(Tr. 35). Our review of the records reveals that this analysis by the ALJ in concluding that Serrano had mild to moderate limitations resulting from his depression and anxiety is supported by substantial evidence; that is, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565.

The plaintiff also argues the ALJ mischaracterized his literacy in concluding he can "read and write with limitations" instead of finding him to be illiterate. Under the regulations, "[i]lliteracy means 'the inability to read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has little or no formal schooling.'" Frontanez-Rubiani v. Barnhart, No. CIV.A. 03-1514, 2004 WL 2399821, at *5 (E.D. Pa. Sept. 30, 2004) (quoting 20 C.F.R. § 416.964(b)(1)). The ALJ concluded that Serrano had a "marginal education," acknowledging his fifth-grade education but did not find him to be illiterate. A review of the record reveals that Serrano reported that he has a learning disability, (Tr. 1085), needed help with both reading and writing, (Tr. 1087), had limited reading and writing skills, (Tr. 1163), and had "reading and writing issues," (Tr. 1090), and he testified at the hearing that he could not read or

write very well and he took ten years of classes in prison but could not pass his GED because he did not know how to read. (Tr. 70-71).

As the Commissioner points out, the issue of literacy relates not to the RFC but is "a component of the education characteristic under the Medical–Vocational Guidelines," considered when evaluating the work available to the claimant. Frontanez-Rubiani v. Barnhart, No. CIV.A. 03-1514, 2004 WL 2399821, at *4 (E.D. Pa. Sept. 30, 2004) (citing Wolfe v. Chater, 86 F.3d 1072, 1076-77 (11th Cr. 1996)). The plaintiff argues that the failure to articulate any literacy limitation in the hypothetical posted to the VE "calls into question" the VE's testimony since there are education requirements for all the jobs. However, the plaintiff does not go so far as to state that the jobs the VE testified were available to the plaintiff based on his RFC required literacy. In fact, the plaintiff's attorney addressed this issue during the hearing, asking the VE if any of the available positions required reading or writing, to which the VE responded they did not. (Tr. 79). The VE also testified the available positions would all be able to be learned by demonstration. (Id.) Thus, although the ALJ could have reached a different conclusion on the issue of literacy based on the equivocal evidence which overall demonstrated that the plaintiff stated he had limited abilities in reading and writing, not only was the ALJ's conclusion that he could read and write with limitations supported by more than a scintilla of evidence,

but any error on this score would have been harmless, since literacy was not required for any of the positions available to the plaintiff.

Finally, the plaintiff challenges the ALJ's reliance on the findings of the consultative examiner regarding his activities of daily living. Specifically, the plaintiff argues that the ALJ ignored inconsistencies between the consultative examination report of Dr. Klebanoff, which stated he could cook, clean, do laundry, shop, shower, bathe, and dress, and Serrano's own contemporaneous reports of his abilities on the medical history form he completed for the examination which stated his mother did the cooking, leaning, laundry, and shopping, and he needed assistance to bathe and dress. (Tr. 1755). We acknowledge that this inconsistency was not directly explained in the report by Dr. Klebanoff and there is conflicting evidence regarding whether Serrano was able to perform those specific activities of daily living. However, as the Commissioner points out, Dr. Klebanoff's examination report was based upon not just Serrano's subjective reports as to his activities of daily living, but also his review of the record, which tended to indicate that Serrano was capable of performing those activities. Although Serrano's function report stated that that he needs assistance with dressing and personal care, uses a chair in the shower, and does not know how to use a fork or cook and only uses the microwave to prepare meals, (Tr. 637-38), and he sometimes helps to take out the

trash but that his sister does most of the household chores, (Tr. 638), there is also evidence that he could perform those activities. At the hearing, Serrano testified that he could wash dishes and fold clothes but that he was not allowed to cook because he caused a fire. (Tr. 64-70). And his records show that, in June 2018 he reported fixing things around his mother's house, cutting grass, and doing the heavy work around his mother's home. (Tr. 1048). In September 2020 he stated he was motivated to do his daily activities like leaving home and doing the household chores, (Tr. 1765), and in May 2021 he reported doing many activities outside his home because the weather was nice. (Tr. 1952). Moreover, the ALJ did not solely rely only upon Dr. Klebanoff's reports of Serrano's ability in fashioning the RFC, but upon the overall longitudinal medical evidence, Serrano's own reports of his abilities, the medical opinion evidence, and Dr. Klebanoff's relatively benign examination findings. Thus, any inconsistency in Dr. Klebanoff's report of Serrano's activities of daily living is offset by the balance of objective evidence supporting the ALJ's RFC determination. Taken as a whole this evidence supported the consultative examining physician's opinion.

In addition to the plaintiff's argument that the ALJ misinterpreted the evidence, resulting in an underinclusive RFC, the plaintiff also argues that the ALJ committed multiple errors with symptom evaluation and improperly focused on the

credibility of the plaintiff. As previously articulated, "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." <u>Hantraft</u> at 362. Further, the ALJ is to consider certain factors in symptom evaluation, including activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Most of the plaintiff's arguments on this score are reiterated from his prior contentions regarding the ALJ's mischaracterization of the evidence. For example, we have already concluded that substantial evidence existed to support the ALJ's determination not to include any visual limitations in the RFC, that examinations showed no sensory deficits, and that he properly accommodated the plaintiff's "coinciding constitutional symptoms,"[8] including blurred vision, fatigue, and

---

[8] The plaintiff argues that "coinciding constitutional symptoms" is not articulated clearly enough to provide meaningful review, but just earlier in the same paragraph the ALJ listed these symptoms including blurred vision, malaise, fatigue, and intermittent dizziness. (Tr. 33).

intermittent dizziness by restricting him to medium work except he can never climb ladders, ropes, or scaffolds, can frequently perform other postural activities, and can never be exposed to unprotected heights. Furthermore, in our view, the plaintiff's hearing testimony regarding his limitations was often unconnected to any objective medical evidence and unexplained by any of his impairments.

Thus, the ALJ properly and thoroughly cast these statements against the objective longitudinal record, including examination results and treatments, as well as the medical opinion evidence, in fashioning the RFC. While Serrano argues on appeal that the ALJ erred in this assessment, at bottom this argument invites us to re-weigh the evidence. This we may not do. See, e.g., Rutherford, 399 F.3d at 552 (quoting Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) ("In the process of reviewing the record for substantial evidence, we may not 'weigh the evidence or substitute our own conclusions for those of the fact-finder'")). In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might

have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

<u>*s/ Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: May 14, 2024